UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

GENEO BROWN,

        Plaintiff,

     v.                                    **DECISION AND ORDER**
                                                05-CV-758S

SUPERINTENDENT McGINNIS,
SUPERINTENDENT BURGES,
DIRECTOR PETER RUSSELL,
DR. M. BROWN, *Psychiatrist*,
DR. SATTI, *Psychiatrist*,
DR. ALVIS, *Medical Doctor*,[1]
DENISE FULLER, *Social Worker*,
CHRISTINE ANTENORE, *Social Worker*,

        Defendants.

## I. INTRODUCTION

On October 21, 2005, Plaintiff Geneo Brown filed a complaint in this Court under 42 U.S.C. § 1983, alleging that Defendants conspired against him and violated his rights under the First, Eighth, and Fourteenth Amendments while he was in the custody of the New York State Department of Corrections Services ("DOCS").[2]

Presently before this Court are Plaintiff's and Defendants' dueling Motions for Summary Judgment. (Docket Nos. 49, 60.) For the reasons stated below, Defendants' motion is granted and Plaintiff's is denied.

---

[1] Plaintiff misspells this Defendant's name. It is properly spelled as "Dr. John Alves." (See Answer; Docket No. 11.)

[2] DOCS has since changed its title to Department of Corrections and Community Supervision.

1

## II. BACKGROUND

**A.     Facts**

Plaintiff began a hunger strike on November 12, 2005 at Southport Correctional Facility ("Southport") to protest perceived physical and mental abuse.[3] (Plaintiff's Motion, p. 8; Docket No. 60.[4]) On November 14, 2005, after Plaintiff had missed nine consecutive meals, Defendant Denise Fuller, a social worker at Southport, met with Plaintiff and inquired about his mental and physical health. (Id.) After the meeting, considering the latest hunger strike and Plaintiff's documented history of making complaints that his food was tampered with, Fuller decided that Plaintiff's mental status should be evaluated in the controlled and observable environment of a Residential Crisis Treatment Program ("RCTP"). (Defendants' Statement of Undisputed Facts, ¶ 19; Docket No. 50). Because an RCTP is not available at Southport, Fuller recommended that Plaintiff be transferred from Southport to Elmira Correctional Facility ("Elmira"). (Id. ¶ 32).

Plaintiff was moved to Elmira on November 15, 2005 where he was given an Initial Psychiatric Evaluation (Id. ¶ 36). Defendant Superintendent John W. Burge met with Plaintiff in an attempt to dissuade him from continuing the strike. (Id. ¶ 38.) Plaintiff was unmoved and expressed his concern that his allegations of physical and mental abuse at Southport were not being addressed. (Id.)

---

[3] These allegations of physical and mental abuse are not the subject of this action.

[4] In one filing, referred to in this Decision as "Plaintiff's Motion," Plaintiff combined his Notice of Motion for Summary Judgment, Affidavit in Support of Motion for Summary Judgment, Statement of Facts, and Brief in Support of Motion for Summary Judgment. (Docket No. 60.) Because it is not independently numbered, page numbers refer to the docketed page number.

On November 17, 2005, Defendant Dr. Morales Brown, Elmira's staff psychiatrist, believing that Brown's refusal to eat was not the result of psychopathology, removed Plaintiff from the RCTP and admitted him to the infirmary at Elmira. (Id. ¶ 45.)

Over the following weeks, Plaintiff continued his hunger strike and Defendants Brown, Dr. John Alves Russell, and Dr. Venkata Satti all met with Plaintiff. (Id. ¶¶ 54-76.) On December 13, 2005, with hunger strike ceased and his heath rejuvinated, Dr. Alves medically discharged and transferred Plaintiff from Elmira back to Southport. (Id. ¶ 73.) Four days later, Plaintiff met with Dr. Satti, Clinical Director at the Elmira Psychiatric Center, at which time he continued to fret that prison officials were secretly inserting pills into, and generally tampering with, his food. (Id. ¶ 82.) Consequently, Plaintiff's mental health service level was changed to the highest risk level (Id. ¶¶ 84, 85) and in light of this designation, on December 20, 2005, a Treatment Team transferred Plaintiff from Southport to Auburn Correctional Facility ("Auburn"), where better mental health services were available. (Id. ¶ 87.)

### III. DISCUSSION

**A.     Legal Standards**

  **1.     Motion for Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is "material" only if it "might affect the outcome of the suit under governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  A "genuine"

dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion." Adickes v. S. H. Kress & Co., 398 U.S. 144, 158–59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970) (internal quotations and citation omitted).

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

When the parties cross-move for summary judgment, "the standard is the same as that for individual motions for summary judgment." Natural Res. Def. Council v. Evans, 254 F. Supp. 2d 434, 438 (S.D.N.Y. 2003). "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." Id. (citing Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)).

### 2. 42 U.S.C. § 1983

Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured

by the Constitution and laws.  See 42 U.S.C. § 1983.  On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution.  See Graham v. Connor, 490 U.S. 386, 393-94,109 S. Ct. 1865, 1870, 104 L. Ed. 2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n.3, 99 S. Ct. 2689, 2695, 61 L. Ed. 2d 433 (1979)). Accordingly, as a threshold matter in reviewing claims brought pursuant to § 1983, it is necessary to precisely identify the constitutional violations alleged.  See Baker, 443 U.S. at 140. Here, Plaintiff's claims are grounded in the First, Eighth, and Fourteenth Amendments.

**B.      Motions for Summary Judgment**

Cognizant of the distinct disadvantage that pro se litigants face, this Court has read Plaintiff's submissions carefully and liberally, and has interpreted them to raise the strongest arguments that they suggest.  See Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)

Plaintiff takes issue with his transfer from Southport to Elmira and subsequently from Southport to Auburn alleging that the transfers violated his rights under the First and Fourteenth Amendments  as well as the Religious Land Use and Institutionalized Persons Act (RLUIPA). He also alleges that the conditions at Elmira violated his Eighth Amendment rights.

**1.      First Amendment**

Plaintiff claims that Defendants retaliated against him for engaging in a hunger strike and filing grievances with prison officials. To establish a First Amendment retaliation claim under § 1983, a prisoner must demonstrate: "(1) that his speech or conduct was

5

constitutionally protected, (2) that the defendant took adverse action against him, and (3) that there was a causal connection between the protected speech and the adverse action." Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (quoting Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds by* Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)).

For purposes of the second requirement, adverse action is defined as one "that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Davis v. Goord, 320 F.3d 346,353 (2d Cir. 2003)). "If the action would not deter an individual of ordinary firmness the retaliatory act 'is simply *de minimis* and therefore outside the ambit of constitutional protection.'" Islam v. Goord, No. 05 Civ. 7502, 2006 WL 2819651, at *4 (S.D.N.Y. Sept. 29, 2006) (citing Davis, 320 F.3d at 353).

"Prison officials have broad administrative and discretionary authority over the institutions they manage." Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir.1994) (quoting Hewitt v. Helms, 459 U.S. 460, 467, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983)). Prisoner retaliation claims "pose a substantial risk of unwarranted judicial intrusion in matters of general prison administration." Dawes, 239 F.3d at 491. Additionally, courts recognize that retaliation claims are prone to abuse by prisoners, because they can claim retaliation for any decision that they dislike. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996). Accordingly, the plaintiff must set forth non-conclusory allegations. Dawes 239 F.3d at 491-92. Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. Bennett, 343 F.3d at 137.

It is uncertain if Brown can sustain the argument that his hunger strikes reflected constitutionally protected speech.[5] A hunger strike might be protected by the First Amendment if it was intended to convey a particularized message. See Texas v. Johnson, 491 U.S. 397, 404, 109 S. Ct. 2533, 105 L. Ed. 2d 342(1989) (discussing various other non-verbal forms of communication that may constitute protected speech). However, provided that reasonable and effective means of communication remain open to inmates, and no discrimination in terms of content is involved, prison officials are accorded latitude in fashioning restrictions on the time, place and manner of communications by inmates. Stefanoff v. Hays Cnty., Tex., 154 F.3d 523, 527 (5th Cir.1998). Such restrictions must be reasonably related to legitimate penological interests. Id. Nonetheless, this Court will assume, for the purposes of these motions, that a hunger strike is protected activity in the context of a retaliation claim. See Green v. Phillips, No. 04 CV 10202, 2006 WL 846272, at *3 (S.D.N.Y. Mar. 31, 2006) (assuming, for the sake of argument, that retaliation against an inmate for participation in a hunger strike is a constitutional violation).

But because of the uncertain nature of the protected status of hunger strikes, Defendants are protected from suit by qualified immunity.

Qualified immunity is a vehicle for protecting governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S.

---

[5] Brown has brought similar claims in other courts. See Brown v. Graham, No. 9:07 CV 1353, 2010 WL 6428251 (N.D.N.Y. Mar. 30, 2010) (granting summary judgment in defendants' favor on qualified immunity grounds while finding that a First Amendment claim arising from another of Brown's hunger strikes was "questionable.") Indeed, this Court has also already ruled similarly on yet another of Brown's hunger strike related cases. See Brown v. Poole, No. 05 CV-509 (W.D.N.Y. Aug. 13, 2011).

800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). A government actor is entitled to immunity if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 250 (2d Cir. 2001) (quoting Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996)).

Here, Defendants are entitled to immunity under either of these prongs. First, as noted above, it is unclear whether an inmate's hunger strike is a constitutionally protected activity. The Second Circuit has upheld the practice of force-feeding inmates who are engaging in a hunger strike. Grand Jury Subpoena John Doe v. United States, 150 F.3d 170, 172 (2d Cir.1998). Therefore, at a minimum, this holding confirms that an inmate's right to hunger strike as a First Amendment expression is not "clearly established."

Second, the various Defendants reacted to Plaintiff's hunger strike by following protocols and acting in a subjectively reasonable manner. Defendants determined that due to the nature of the Plaintiff's case and in accordance with DOCS Directive 4301,[6] it would be in Plaintiff's best interest to conduct a more thorough psychiatric evaluation. (Antenore Declaration ¶15; Docket No. 53; Fuller Declaration, ¶ 23; Docket No. 54.) There is no indication that Plaintiff was transferred for any reason other than to provide him with better mental and physical health care. As such, Defendants acted reasonably in addressing the health and safety of Plaintiff, and reacted to Plaintiff's conduct pursuant to established protocol See Brown, 2010 WL 6428251, at *17 (holding that prison official defendants acted pursuant to protocol that was designed to protect the health of inmate and security

---

[6] Establishing satellite areas and permitting transfer of prisoners deemed to require additional health services.

of the institution in the face of unsettled law and were therefore entitled to qualified immunity).

Plaintiff also alleges that the transfers were a retaliation for "numerous grievances" that he filed against prison officials. These undoubtedly constitute constitutionally protected activity. See Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002). However, Plaintiff has failed to demonstrate that Defendants' actions, even assuming that they would deter an individual of ordinary firmness from filing grievances, were causally connected to his protected speech or would not have been imposed otherwise.[7] Contrarily, the record shows that Defendants transferred Plaintiff because of his questionable mental and physical health corresponding to his hunger strike. It is devoid of support for the accusation that Defendants acted with animus or retaliatory intent. For that reason, Defendants' motion on this ground is granted. See Dawes, 239 F.3d at 492 ("To survive summary dismissal, a plaintiff asserting First Amendment retaliation claims must advance non-conclusory allegations.").

### 2. RLUIPA

RLUIPA prohibits the government from imposing a substantial burden on a prisoner's religious practices unless the burden is the least restrictive means of furthering a compelling government interest. 42 U.S.C. § 2000cc-1(a). A substantial burden is one that "pressures [Plaintiff] to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith." Brown, 2010 WL 6428251 at *15. This interference must be more than an inconvenience; the burden

---

[7] This finding precludes Plaintiff's claim regarding hunger strike retaliation even if Defendants were not protected by qualified immunity.

must be substantial and an interference with a tenet or belief that is central to religious doctrine. Id. (citing Pugh v. Goord, 571 F. Supp. 2d 477, 504–05 (S.D.N.Y.2008)).

Plaintiff cites biblical passages to show that his religion recognizes fasting as a peaceful protesting method. But, regardless of whether fasting is mandated by Plaintiff's religion, he has not established that Defendants substantially burdened his practices. Plaintiff argues that his transfers made it difficult to "fast and . . . express himself without the 'stigma' of appearing mentally ill." (Plaintiff's Motion p. 27). This does not amount to a substantial burden. See Gladson v. Iowa Dep't of Corr., 551 F.3d 825, 831 (8th Cir. 2009) (holding that a prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so). Defendants did not force-feed Plaintiff or stop his hunger strike. They merely transferred him to a location better suited for his condition and advised him of the health risks associated with his decision to refuse food. Indeed, there is no dispute that Plaintiff was permitted to, and did continue, fasting after his transfer to Elmira.[8] Consequently, Defendants' motion on this claim is granted.[9]

### 3. Eighth Amendment

The Eighth Amendment to the United States Constitution applies to the States through the Fourteenth Amendment, and "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." Wilson v. Seiter, 501 U.S. 294, 297, 11 S. Ct.

---

[8]Plaintiff does not raise any allegations concerning his treatment at Auburn. To the extent that he believes the simple transfer there violated RLUIPA, that claim is dismissed for the same reasons discussed above.

[9]Insofar as Plaintiff's RLUIPA claim is asserted against defendants in their official capacities, dismissal of such claim is also compelled by the Supreme Court's recent holding in Sossamon v. Texas, --- U.S. ----, 131 S. Ct. 1651, 1663, 179 L. Ed. 2d 700 (2011) ("States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA.").

2321, 2323, 115 L. Ed. 2d 271 (1991); U.S. Const. amend. VIII.  As such, prison conditions and the treatment prisoners receive while incarcerated are subject to scrutiny under the Eighth Amendment.  See DeShaney v. Winnebago Cnty Dep't of Social Servs., 489 U.S. 189, 199-200, 109 S. Ct. 998, 1005-1006, 103 L. Ed. 2d 249 (1989).

Plaintiff alleges that Defendants violated his Eighth Amendment rights by subjecting him to cruel and unusual punishment when they detained him in the Mental Health Unit observation room and the infirmary isolation room.

A valid conditions-of-confinement claim under the Eighth Amendment requires that the plaintiff prove that (1) the conditions of his confinement were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." Wilson, 501 U.S. 294 at 297-99. To satisfy the first element, which is objective, the plaintiff must demonstrate that the conditions under which he or she was confined resulted "in unquestioned and serious deprivations of basic human needs." Anderson v. Coughlin, 757 F.2d 33, 35 (2d Cir.1985) (citing Rhodes v. Chapman, 452 U.S.  337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59). The second, subjective component "requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." Sims v. Artuz, 230 F.3d 14, 21 (2d Cir. 2000) (citations omitted).

Plaintiff alleges that he was forced to wear a smock, denied a change of clothes, and forced to sleep on a floor mat for two days. Defendants paint a different, albeit not entirely contradictory picture. Dr. Alves states that he was given three meals per day along with nutritional supplements, that he was under constant medical supervision, given full

11

access to mental health services and family visits, and that he was provided with appropriate hospital clothing consisting of scrub pants and top/hospital gown and appropriate toileting. (Alves Declaration, ¶ 10; Docket No. 52.) Evidence demonstrates that upon entering the infirmary, Plaintiff was given full privileges and his clothing was returned. (Russell Declaration, Exhibit I, Clifford Bough Examination Notes, 11/17/05; Docket No. 59.)

As an initial matter, Plaintiffs allegations fail to raise constitutional concerns. "After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Trammel v. Keane, 338 F.3d 155, 162 (2d Cir. 2003) (quoting Ingraham v. Wright, 430 U.S. 651, 670, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977). None of Plaintiff's allegations demonstrate that he was "denied basic human needs, such as food, clothing, shelter, medical care, and reasonable safety, or [that he was] exposed to conditions that pose an unreasonable risk of serious damage to his future health." Williams v. Carbello, 666 F. Supp. 2d 373, 378 (S.D.N.Y. 2009) (citing Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002)).

The Second Circuit has held that, as a regular method of housing inmates, forcing prisoners or pre-trial detainees to sleep on mattresses placed on the floor does not pass constitutional muster, Lareau v. Manson, 651 F.2d 96, 107 (2d Cir. 1981), but this should not be considered a *per se* rule, see Peterkin v. Walker, 101 F.3d 681, 1996 WL 146530, at *1 (table) (2d Cir. 1996), and Elmira does not force inmates to sleep on the floor "as a regular method." A proper analysis requires this Court to consider all the particular circumstances of the case. See Bell v. Wolfish, 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979). In that light, it must be noted that Plaintiff had to sleep on a floor mat for only

two days and that Plaintiff's alleged deprivations were the result of Defendants' efforts to respond to Plaintiff's hunger strike. As such, the deprivations do not implicate the Constitution. See Ford v. Phillips, No. 05 Civ. 6646(NRB), 2007 WL 946703 (S.D.N.Y. Mar. 28, 2007) (minor and temporary deprivations of property, showers and recreation "in no way involved the severity of treatment which must be shown to make out a case of cruel and unusual punishment"); McCorkle v. Walker, 871 F. Supp. 555, 557 (N.D.N.Y.1995) (no Eighth Amendment violation where plaintiff was not given a change of underwear for fifteen days); Brown, 2010 WL 6428251, at *12 (no Eighth Amendment violation where the plaintiff was temporarily placed in the Auburn Mental Health Unit with only a smock and two canvas mats).

Further, Plaintiff has not met his burden of producing sufficient evidence that Defendants acted with deliberate indifference. He does not dispute that he was attended to by various medical professionals on a near daily basis while at Elmira and that his physical and mental conditions were consistently and painstakingly addressed by these professionals. In addition to demonstrating that the totality of the circumstances were not so harsh as to be considered cruel and unusual, see Rhodes 452 U.S. at 363, this also demonstrates that Defendants "were mindful of, not indifferent to, his health." See Trammel, 338 F.3d at 164.  Accordingly, Defendants' motion for summary judgment is granted on this claim.

### 4. Fourteenth Amendment

Plaintiff alleges that Defendants violated his Fourteenth Amendment due process rights by transferring him from Southport to Elmira and subsequently from Elmira to Auburn without giving him a hearing or any administrative review.

The Fourteenth Amendment provides, in pertinent part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. There are two broad categories of due process claims — substantive and procedural. A substantive due process claim is based upon the deprivation of a constitutionally protected life, liberty, or property interest. See B.D. v. DeBuono, 130 F. Supp.2d 401, 431 (S.D.N.Y. 2000). A procedural due process claim is based upon the deprivation of a protected life, liberty, or property interest, without notice and an opportunity to be heard. Id. at 432-33. With respect to any due process claim – substantive or procedural – "[t]he threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." Narumanchi v. Bd. of Trs. of Conn. State Univ., 850 F.2d 70, 72 (2d Cir. 1988).

Thus, to establish a due process violation, an inmate must prove that defendants interfered with his protected liberty interests by satisfying a two-part test: "(1) the confinement or restraint must create an 'atypical and significant hardship in relation to the ordinary incidents of prison life'; and (2) the state must have granted a liberty interest by statute or regulation to be free from that confinement or restraint." Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. 1996) (citing Sandin v. Conner, 515 U.S. 472, 484, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)).

But Plaintiff's claim fails because an inmate does not have a due process right to challenge a transfer from one facility to another. Prins v. Coughlin, 76 F.3d 504, 507 (2d Cir. 1996); Meachum v. Fano, 427 U.S. 215, 225, 96 S. Ct. 2532, 49 L. Ed. 2d 251 (1976) (explaining that "the Due Process Clause in and of itself [does not] protect a duly convicted prisoner against transfer from one institution to another within the state prison system");

Gilmore v. Goord, 415 F. Supp. 2d 220, 223 (W.D.N.Y. 2006) (noting "transfers from one facility to another generally do not implicate any protected liberty interest").

Concerning his confinement at Elmira, the Supreme Court has noted that an involuntary commitment to a state mental hospital would be a hardship that would qualify as "atypical and significant," because of the "stigmatizing consequences" caused by such a confinement. Sandin, 515 U.S. at 479, n. 4. Seizing on this language, Plaintiff argues that he was stigmatized by his confinement at Elmira. But neither the RCTP, nor the Elmira infirmary are "mental hospitals." See Cabassa v. Gummerson, No. 9:01 CV 1039, 2008 WL 4416411, at *11 (N.D.N.Y. Sep. 24, 2008). Moreover, "it is difficult to characterize plaintiff's stay there as involuntary, since that stay was caused by his choice to conduct a 'hunger strike.'" Id. (finding that the plaintiff's confinement in the Auburn infirmary for 101 days and 50 days Special Housing confinement was not "atypical and significant").

Prison officials have the right and the duty to take measures reasonably necessary to preserve order and security within the prison and to safeguard inmates committed to their custody and care. This necessarily includes the right and duty to take reasonable measures to insure the physical and mental health of inmates engaged in hunger strikes. See Grand Jury Subpoena John Doe, 150 F.3d at 172 (upholding the forced feeding of an inmate engaged in a hunger strike for political and religious reasons).

This Court finds that the periods of confinement in question were not "atypical and significant" for purposes of Sandin. Therefore, Plaintiff has failed to demonstrate that Defendants interfered with a protected liberty interest and, accordingly, summary judgment in the Defendants' favor is warranted.

### 5. Conspiracy

Plaintiff alleges that Defendants conspired against him when they "illegally transferred Plaintiff to Elmira's Mental Housing unit's RCTP, then to Auburn's Special Housing Unit as a level one mental patient."

To sustain § 1983 conspiracy claim, a plaintiff must prove: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 67, 72 (2d Cir. 1999) (citing Carson v. Lewis, 35 F. Supp. 2d 250, 271 (E.D.N.Y. 1999)).

The record establishes that various Defendants had dealt with and entered into agreements regarding the Plaintiff's transfers. But regarding the second requirement, Plaintiff has not established that Defendants violated his constitutional rights. Because a "§ 1983 conspiracy claim fails as a matter of law where there is no underlying constitutional violation," Mitchell v. Cnty. of Nassau, CV-05-4957, 2011 U.S. Dist. LEXIS 30748, at *46 (E.D.N.Y. Mar. 24, 2011) (citing Curly v. Vill. of Suffern, 268 F.3d 65, 72 (2d Cir. 2001), summary judgment in Defendants' favor is warranted.[10]

### V. ORDERS

IT IS HEREBY ORDERED, that Defendants' Motion for Summary Judgment (Docket

---

[10]Although Plaintiff does not explicitly assert a Fourth Amendment violation, he does note that he was stripped searched upon entering the RCTP at Elmira. Even if Plaintiff sought to assert a claim based on this search, it would be without merit. Defendants conducted the search pursuant to DOCS directive 4910, section IV-F-1, which directs that, without exception, each inmate is strip frisked before entering the Mental Health Unit. The directive is related to a legitimate penological function, namely, to ensure inmates that enter and leave the Mental Health Unit do not possess contraband. See Covino v. Patrissi, 967 F.2d 73, 78-79 (2d Cir. 1992); see also Gonzalez v. Narcato, 363 F. Supp. 2d 486 (E.D.N.Y. 2005) (upholding the constitutionality of DOCS directive 4910).

No. 49) is GRANTED.

FURTHER, that Plaintiff's Motion for Summary Judgment (Docket No. 60) is DENIED.

FURTHER, that any appeal from this Decision would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. See Coppedge v. United States, 369 U.S. 438, 82 S. Ct. 917, 8 L. Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

FURTHER, that the Clerk of the Court shall close this case.

SO ORDERED

Dated: January 29, 2012
      Buffalo, New York

                                      /s/William M. Skretny
                                      WILLIAM M. SKRETNY
                                      Chief Judge
                                      United States District Court